Filed 8/5/25  P. v. Stanfield CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JEREL ISONE STANFIELD,<br><br>    Defendant and Appellant. | F086329<br><br>(Super. Ct. No. F13903065)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary and Jesica Y. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Jerel Isone Stanfield was convicted by a jury of murder and assault with a firearm. He was sentenced to 10 years, plus 50 years to life. On appeal, Stanfield challenges the testimony of a firearms expert. He argues the trial court erred by allowing the expert to testify that the bullet casings from the crime scene matched the casings from a recovered firearm, without laying a proper foundation for the opinion. He also argues the court erred in instructing the jury with CALCRIM Nos. 319 and 337. Stanfield further contends the court failed to investigate potential juror bias, and finally, applied the wrong legal standard when it denied his motion for a mistrial. We reject Stanfield's claims and affirm the judgment.

## PROCEDURAL BACKGROUND

On November 1, 2013,[1] the Fresno County District Attorney filed an information charging Stanfield with murder (Pen. Code,[2] § 187, subd. (a); count 1); assault with a firearm (§ 245, subd. (a)(2); counts 2, 6, 7); evading an officer (Veh. Code, § 2800.2, subd. (a); count 3); assault with a deadly weapon on a peace officer (§ 245, subd. (c); count 4); possession of a firearm by a felon (§ 29800, subd. (a)(1); count 5); and shooting at an occupied motor vehicle (§ 246; count 8).

The information further alleged Stanfield personally and intentionally discharged a firearm (§ 12022.53, subd. (d); count 1), the crime was committed for the benefit of a criminal street gang (§ 182.22, subd. (b)(1); counts 1, 2), Stanfield personally used a firearm during the commission of the crime (§ 12022.5, subd. (a); counts 2, 6, 7, 8), Stanfield was armed with a firearm during the commission of the crime (§ 12022, subd. (a)(1); count 3), and Stanfield personally inflicted great bodily injury (§ 12022.7, subd. (a); counts 6, 7). It was also alleged that Stanfield had been convicted of one or more serious and/or violent felonies within the meaning of the Three Strikes law (§§ 667,

---

[1] All further date references are to 2013, unless otherwise stated.

[2] Undesignated statutory references are to the Penal Code.

subds. (b)-(i), 1170.12, subds. (a)-(d)) and suffered a prior felony conviction (§ 667.5, subd. (b)).

On March 28, 2017, a jury found Stanfield guilty on count 3 (Veh. Code, § 2800.2, subd. (a)), hung on the enhancement allegation attached to count 3 (§ 12022, subd. (a)(1)) and not guilty on count 4 (§ 245, subd. (c)).  The jury was hung on the remaining counts and allegations and a mistrial was declared as to counts 1, 2, 5, 6, 7, and 8, and the enhancements attached to those counts.  On May 3, 2017, Stanfield was sentenced to six years in prison.

Stanfield appealed his sentence.  This court affirmed the judgment.  (*People v. Stanfield* (Jun. 3, 2019, F075642) [nonpub. opn.].)

On January 10, 2023, the Fresno County District Attorney filed a first amended information charging Stanfield with murder (§ 187, subd. (a); count 1), assault with a firearm (§ 245, subd. (a)(2); count 2), and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 3).  The information further alleged that Stanfield personally used a firearm as to counts 1 (§ 12022.53, subd. (d)) and 2 (§ 12022.5, subd. (a)), and that he had a prior serious felony conviction (§§ 667, subds. (b)-(i)), 1170.12, subds. (a)-(d)).

On February 9, 2023, the jury found Stanfield guilty as charged on counts 1 and 2. The jury found Stanfield guilty of a misdemeanor in count 3, which was later dismissed by the trial court.[3]  Stanfield admitted he suffered a prior conviction.

On May 16, 2023, the trial court sentenced Stanfield to 10 years plus 50 years to life as follows:  on count 1, 25 years to life, plus 25 years to life for the firearm enhancement, and on count 2, a term of six years, plus four years for the firearm enhancement.

---

[3] The trial court found the verdict was illegal because the charge was filed as a felony, but the jury found Stanfield guilty of a misdemeanor.  Thus, count 3 was dismissed.

# FACTUAL BACKGROUND

## A. The Prosecution's Case

### 1. Murder of W.S.

L.R. knew Stanfield because he was her brother's best friend; they had been around each other on "thousands" of occasions. W.S. was L.R.'s fiancé. Stanfield was a member of the Strother Boys gang. W.S. was a member of the Dog Pound gang.[4]

About a week before the shooting, while L.R. and W.S. were inside their car at a gas station, Stanfield pointed a gun at them. Stanfield was in his charcoal SUV. After the incident, L.R. yelled at W.S. for wearing a "P" hat, which indicated he was a member of the Dog Pound gang.

In the early morning hours of March 31, L.R., W.S., and her three-year-old son parked their car outside of L.R.'s sister's apartment. When L.R.'s sister did not answer the door, they decided to sleep in the car until the morning. L.R. slept in the backseat of the car with her son, while W.S. stayed in the driver's seat. At about 3:00 a.m., L.R. awoke to the sound of a gunshot. After she first made sure her son was okay, L.R. noticed W.S. was not in the driver's seat. L.R. saw Stanfield outside the front windshield of her car pointing a gun at her. L.R. got out of the passenger side of the car and watched Stanfield get inside a charcoal SUV and back out of the area. On the night of the shooting, W.S. wore a hat with a "P" on it.

Once the SUV left, L.R. noticed W.S. laying on the ground in front of the car, choking and gasping for air. L.R. called an ambulance and then ran to get help. In the 911 call, L.R. told the dispatcher that W.S. had been shot and was not breathing. She stated a grey car "rolled up" and then left the area.

---

[4] The parties stipulated that on March 31, Stanfield was a member of the Strother Boys gang and W.S. was a member of the Dog Pound gang. Both gangs were defined by the California criminal statute as criminal street gangs.

At about 3:15 a.m., Officer Steven Jacobson responded to L.R.'s 911 call. Jacobson found L.R. screaming and yelling. He also saw W.S. lying unconscious near the car, bleeding from gunshot wounds to his abdomen, chest, and back. W.S. was taken to the hospital but died from multiple gunshot wounds.

A neighbor sleeping with her windows open awoke to the sound of gunshots in the early morning of March 31. The neighbor heard five shots fired in the direction of the parking lot of the apartment complex. When she went to investigate, she saw a gray or black SUV back out and drive off.

## 2.  The Pursuit of Stanfield

At about 1:30 p.m. on March 31, Officer Ignacio Ruiz was outside Stanfield's house in an unmarked car. Ruiz saw Stanfield come out of the house and get into a black SUV. Ruiz followed Stanfield onto the freeway and called for backup officers. About four marked patrol cars joined the pursuit and activated their lights and sirens; Stanfield ignored them and continued traveling at a high rate of speed. Police conducted a "PIT maneuver" and eventually collided with Stanfield's SUV in a residential area.

After the SUV stopped, Stanfield exited and ran down the sidewalk, ignoring commands made by officers to stop and raise his hands. The officers saw Stanfield reaching for his waistband. Two officers fired about three shots at Stanfield. Stanfield was hit by one of the shots and fell to the ground. Officers provided first aid until paramedics arrived. While Stanfield received first aid, a loaded, black semiautomatic Glock firearm was found in his right waistband area.[5] Immediately after Stanfield was

---

[5]  Testimony differed slightly regarding the location of Stanfield's firearm found after he was shot. Sergeant Mike Palomino testified he saw Sergeant Clayton Smith holding the firearm; he seemed to pull it from Stanfield's right waistband area. Sergeant Conrado Martin testified he saw the firearm right next to Stanfield after he was on the ground. Officer Charles Renfro saw the firearm fall out of Stanfield's right pant leg after his leg was manipulated up and bent at the knee. Officer Ron Flowers noticed a firearm in Stanfield's right waistband area. Sergeant Smith saw the firearm in Stanfield's crotch

shot, several people in the neighborhood became angry and began "fighting" with the police. Stanfield was taken to the hospital.

### 3. Interviews of L.R.

Lieutenant Andre Benson held five interviews with L.R. Only the last interview was recorded because L.R. asked Benson not to record the initial interviews; she was extremely frightened.

On March 31 at 5:00 a.m., L.R. told Benson she believed she saw Stanfield near the front bumper of her car earlier that morning. Stanfield was best friends with her brother. Stanfield got into the passenger side of a silver SUV and drove away. She did not mention seeing him shoot anyone or armed with a firearm. When asked to explain whether she saw anyone shoot W.S., L.R. advised Benson she needed to "think about her situation" and expressed fear for her life and the life of her child.

A few hours later, Benson conducted a second interview. When Benson asked again if L.R. saw anybody shoot W.S. earlier that morning, she further expressed concerns and said she wanted more time to think about her situation. Thereafter, she said Stanfield killed W.S.

In the third interview, around 9:00 p.m. on March 31, L.R. indicated she knew Stanfield was taken into custody and asked if Stanfield had a firearm when he was arrested. When Benson said Stanfield had a firearm on him, L.R. told Benson to have the firearm found on Stanfield tested because she "guaranteed" it would be the same firearm that was used to kill W.S.

The fourth interview of L.R. took place on April 5 at 11:00 p.m. L.R. said she knew Stanfield killed W.S. L.R. advised she was inside the car, she heard gunshots and

---

area. Officer Scott Shepard testified the firearm was found either underneath Stanfield or in his rear waistband and another officer retrieved the firearm and tossed it towards Stanfield's feet.

6.

reached for her small child. L.R. observed Stanfield standing by the front bumper on the driver's side of her car. He was armed with a black gun and had his right arm extended out towards the front of her car.[6] L.R. and Stanfield made eye contact and Stanfield pointed the gun in her direction before getting into his silver SUV. When asked why she did not reveal this information before, she said she was "scared" and apologized to Benson for not being forthcoming about Stanfield being in possession of a firearm.

The last interview of L.R. was recorded on April 7. Benson reviewed his written reports regarding the prior interviews he had with L.R. to make sure the information was accurate. His trial testimony comported with the information in the last interview.

### 4. The Evidence

The firearm, magazine, and ammunition were examined by a criminologist who performed a latent fingerprint analysis. The criminologist found no latent fingerprints; the firearm, magazine, and ammunition were clean.

L.R.'s 911 call was placed around 3:12 a.m. About 10 minutes prior, at about 3:02 a.m., Stanfield's cell phone was approximately one and a half miles away from where W.S. was shot. This distance took law enforcement about four minutes to drive the route from the crime scene to the location where Stanfield's phone was located about 10 minutes before the shooting occurred.[7]

The Glock firearm that was found near Stanfield after he was shot was test fired using laboratory ammunition in a water tank by criminalist Nancy McCombs. McCombs compared the casings from the test fires with the seven casings found at the scene of the crime where W.S. was shot and concluded they were fired from the same Glock firearm.

---

[6] This was the first time L.R. told Benson she witnessed Stanfield armed with a firearm in the early morning of March 31.

[7] Benson testified the distance between the location of the shooting and the phone's location was about three minutes and 40 seconds.

## B. The Defense

Officer Michael John Neveu responded to the call involving Stanfield on March 31. When Neveu first saw Stanfield, he was running away from the SUV. Neveu did not see Stanfield turn towards the officers with a firearm. Stanfield was shot in the back of the head and landed face first; he did not see a firearm fall when Stanfield hit the ground. After Stanfield hit the ground, he was immediately turned over and medical aid was provided. He did not see Stanfield with a firearm while he was running, but he could not see his right hand. After Stanfield was shot, Neveu immediately assisted with handling the hostile crowd at gunpoint for over 25 minutes. He did not walk back to Stanfield or the officers providing medical aid to see whether a firearm was found.

Lionel Thompson was outside his home at about 2:00 p.m. on March 31 when he saw Stanfield's SUV being followed by police officers. Once the SUV came to a stop against a tree, he witnessed Stanfield exit and begin to run. Thompson did not observe a firearm on Stanfield. He also did not see Stanfield reach for his waistband or notice anything in his hands.

Ruben Lopez and Donald McElvane were in the neighborhood on the afternoon of March 31 and witnessed Stanfield's SUV crash, and Stanfield exit and run away from officers. Lopez said Stanfield did not have a gun. In the seconds before police shot Stanfield, Lopez saw Stanfield's hands at his sides. McElvane did not see anything in Stanfield's hands while he was running. After Stanfield was shot, McElvane did not see officers recover a gun. However, McElvane saw a gun next to Stanfield after the paramedics arrived about five minutes later.

Peter English, chair of the Department of Criminology at Fresno State University testified regarding eyewitness identification and how it applies to cognitive psychology. Highly stressful and traumatic situations present a downgrade in memory. Environmental conditions, such as the weather being cold and rainy, being in the presence of a child

when gunshots are fired, as well as time and fatigue all contribute to a degraded memory. The fact that the person identifying knew the person whom they identified can be a significant factor regarding identification.

David Faigman, chancellor and dean at the University of California College of Law, and professor at the University of California San Francisco School of Medicine, testified that "serious concerns" have been raised by reports from the National Research Council of the National Academies and the President's Committee with tool mark and firearms examination. Faigman said scientists are most concerned about the "error rate" in this field. Firearms examiners are generally good at class characteristics; examiners can say with "high confidence" that casings came from a type of gun or class of guns. However, the research does not support a firearm examiner to testify that the casings came from a particular gun.

Stanfield's girlfriend's sister, D.T., stayed at Stanfield's girlfriend's apartment on the night of March 30 through the early morning hours of March 31 because she was watching her sister's kids. Stanfield was in and out of the apartment that night. Stanfield and D.T. got into an argument that night because he was "drinking" and loud, which woke the kids up. Stanfield was at the apartment between 2:00 and 3:00 a.m. on March 31.

Officer Michael Maguire responded to the shooting at about 4:00 a.m. on March 31. He talked to a neighbor who recalled seeing a silver SUV earlier that morning.

## DISCUSSION

### I.    Expert Toolmark Testimony

Stanfield argues the trial court erred by admitting McCombs's expert toolmark testimony because she did not lay a proper foundation for her opinion. He contends the court failed to act as a " ' "gatekeeper" ' " to exclude speculative expert testimony, and he suffered prejudice as a result. The People contend the court did not abuse its discretion in

admitting the evidence, and any error in its admission was harmless. We agree with the People.

## A. Additional Background

### 1. Motion in Limine

On January 9, 2023, defense counsel moved in limine to exclude the testimony of the prosecution's ballistics expert as inadmissible testimony to the extent she testified in absolute terms or to a scientific certainty that the firearm used in the shooting matched the firearm found near Stanfield. Defense counsel urged the court to comport McCombs's testimony to the "prevailing state of applied forensic science." Defense counsel cited several studies and exhibits recognizing the limitations of forensic ballistics. He requested a hearing to determine the admissibility of McCombs's testimony, or in the alternative, exclusion of her testimony altogether.

On January 27, 2023, the trial court held an Evidence Code section 402 hearing for the purpose of discussing the parameters of McCombs's testimony. At the hearing, the court first said it was aware of the limitations set forth in *People v. Azcona* (2020) 58 Cal.App.5th 505 (*Azcona*). The court also commented that under *Azcona* and *People v. Cowan* (2010) 50 Cal.4th 401 (*Cowan*), "the *Kelly*[8] rule … is "essentially inapplicable, but even if it were applicable … the ballistics and firearms testimony that is typically admitted is admissible as a science."

The trial court understood McCombs would testify to her observations of the firearms analysis she conducted and the marks she observed on the shell casings. The court said McCombs could testify based upon her perceptions and examinations and could be cross-examined on her knowledge of ballistics scientific comparison. Defense counsel argued McCombs could state her conclusions based on her training and experience but could not present the evidence as to a scientific certainty or to the

---

[8] *People v. Kelly* (1976) 17 Cal.3d 24.

exclusion of all other weapons, which would exceed the scope permissible in *Azcona*. The prosecutor responded McCombs could offer her opinion based on her training and experience, although agreed she could not testify in certain terms.

The trial court held McCombs could testify based upon her training, experience, and work in this case as to why it was her opinion the shell casings came from Stanfield's firearm. However, the court ruled it would not allow McCombs to testify to a scientific certainty or to the practical exclusion of all other guns. McCombs's testimony would be limited to the guns she examined and what could be supported by her own work.

### 2. *Expert Witness Testimony at Trial*

McCombs testified at trial as the expert in the field of firearm and toolmark analysis and shell casing identification. She had been a senior criminalist for approximately 25 years and is a member of the California Association of Criminalists and the Firearms and Tool Marks Examiners. McCombs formerly taught at numerous police departments about firearm examination. She taught at the Alcohol, Tobacco and Firearms Academy for 20 years. McCombs is certified in firearms, tool marks and gunshot residue analysis, and undergoes proficiency tests in all three areas every year to maintain her certification.

In this case, McCombs analyzed the Glock firearm near Stanfield and the seven shell casings found at the scene of W.S.'s murder. She test-fired the Glock firearm with six rounds of laboratory ammunition into a water tank. Under a microscope, McCombs compared the class characteristics and markings found on the test-fired casings with the marks found on the seven casings recovered from the crime scene. She also compared the test-fired casings to themselves to make sure they were reproducible to that firearm. She testified that Glocks leave "excellent" firing pin aperture sheer marks and based on McCombs's personal experience and observations, she has never seen two firing pin marks from two separate guns match, explaining that the "tool mark is very individual."

Based on this testing method and McCombs's personal training, experience, and observation of the seven casings that were submitted compared to the test-fires from the Glock, McCombs opined the casings recovered from the scene had been fired by the Glock found near Stanfield that she test-fired in her lab. The trial court overruled defense counsel's immediate objection that McCombs's response was speculative. The court held McCombs's opinion was admissible because it was based on her personal experience and observation. McCombs further testified she "don't have any doubt" that the shell cases from the scene had been fired by the Glock firearm found near Stanfield. Defense counsel moved to strike McCombs's response. The court again overruled defense counsel's objection, stating that McCombs's opinion was proper because it was based on her own personal confidence level and observations.

McCombs followed the Association of Tool Mark Examiners criteria. McCombs acknowledged her findings were subjective, and other experts might reach different conclusions. McCombs did not compare the casings from the scene to another Glock firearm, so she could not tell whether the marks were unique to the firearm found near Stanfield or other Glock firearms she did not personally test. McCombs recognized there is criticism in the field of toolmark analysis and specifically regarding the reliability of testing and analysis.

## B. Applicable Law

The trial court "has the duty to act as a 'gatekeeper' to exclude speculative expert testimony" under Evidence Code sections 801 and 802,[9] even where the expert testimony

---

[9] Evidence Code section 801 provides: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion

12.

offered does not require a *Kelly* analysis.**10** (*Sargon*, *supra*, 55 Cal.4th 747, 753.) Under Evidence Code section 801, " 'irrelevant or speculative matters are not a proper basis for an expert's opinion.' " (*Sargon* at p. 770.) The court may exclude such testimony when acting as a gatekeeper. Additionally, under Evidence Code section 802, the court may "inquire into, not only the type of material on which an expert relies, but also whether that material actually supports the expert's reasoning." (*Sargon* at p. 771.) Taken

---

upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

Evidence Code section 802 provides: "A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion. The court in its discretion may require that a witness before testifying in the form of an opinion be first examined concerning the matter upon which his opinion is based."

**10** The "*Kelly* rule provides that the 'admissibility of expert testimony based on "a new scientific technique" requires proof of its reliability—i.e., that the technique is " 'sufficiently established to have gained general acceptance in the particular field to which it belongs.' " ' " (*Cowan, supra,* 50 Cal.4th at p. 469.) "*Kelly* applies only to ' "that limited class of expert testimony which is based, in whole or in part, on a technique, process, or theory which is *new* to science and, even more so, the law." ' " (*Id.* at p. 470.) However, here, as the trial court pointed out, *Kelly* does not apply because firearm toolmark analysis is not new to science or the law, is not " 'so foreign to everyday experience as to be unusually difficult for laypersons to evaluate' " and is admissible. Stanfield does not raise the issue as to whether *Kelly* applies on appeal, but argues the court abandoned its gatekeeping role under *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 753 (*Sargon*). (See *People v. Spector* (2011) 194 Cal.App.4th 1335, 1372, fn. 12 [declining to address issue not raised properly in opening brief].) We will examine whether the court abandoned its gatekeeping role, since Stanfield attacked McCombs's method and the foundation upon which it was based rather than what is generally accepted in the scientific community. (See *Azcona, supra*, 58 Cal.App.5th at pp. 512-513 [reviewing court rejected the defendant's challenge to the expert toolmark testimony under *Kelly* because the defendant did not prove that the technique used was not accepted by a majority of the scientific community, however, the court analyzed whether the evidence was admissible under Evid. Code, §§ 801 and 802].)

together, under Evidence Code sections 801 and 802, "the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Sargon* at pp. 771-772.)

However, the trial court must be cautious in excluding expert testimony. To be sure, the court's "gatekeeping role" does not involve choosing between one expert conclusion over another based on its persuasiveness, rather, the court should "determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture." (*Sargon, supra*, 55 Cal.4th at p. 772.) The court's gatekeeping role " 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.' " (*Ibid.*)

We review a trial court's ruling to exclude or admit expert testimony for abuse of discretion. (*Sargon, supra*, 55 Cal.4th at p. 773; *People v. McWhorter* (2009) 47 Cal.4th 318, 362.) A trial court abuses its discretion when its ruling "is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

## C. Forfeiture

We first turn to whether Stanfield's claim is preserved on appeal. Generally, the failure on behalf of a party to object to the admission of expert testimony at trial forfeits an appellate claim that the admission of the evidence was improper. (*People v. Perez* (2020) 9 Cal.5th 1, 7; *People v. Stevens* (2015) 62 Cal.4th 325, 333.) The rule requiring an objection to the admission of evidence is necessary to preserve the issue for appeal because a contrary rule would deprive the prosecution of the opportunity to cure the defect at trial and serves to prevent error. (*People v. Partida* (2005) 37 Cal.4th 428, 434.)

14.

Defense counsel moved to exclude McCombs from testifying that the firearm she examined was used by Stanfield to a scientific certainty during the commission of the crime. Defense counsel offered contemporaneous objections at trial based on the speculative nature of McCombs's testimony when she testified based on her level of confidence that the casings found at the scene were from the firearm found near Stanfield later that day.[11] We acknowledge Stanfield's appellate claim is slightly more specific. He now argues McCombs's testimony was speculative *and* lacked foundation. However, the court's responses to defense counsel's objections show that the court understood his objections to include the basis for McCombs's opinion. For example, in overruling defense counsel's objection, the court held McCombs could testify to her "personal experience and observation in examining the specific items." McCombs's personal observation based on the tests she performed, and her examination of the casings, was the foundation the court found was proper. Thus, defense counsel's contemporaneous objections were reasonably specific to preserve Stanfield's appellate claim. (C.f. *People v. Jackson* (2016) 1 Cal.5th 269, 328 [the failure to make a timely and specific objection on the ground asserted on appeal makes that ground not cognizable].)

## D. Analysis

Relying on *People v. Tidd* (2024) 104 Cal.App.5th 772 (*Tidd*)[12] and *Azcona*, Stanfield contends the trial court erred in admitting McCombs's conclusion that she had

---

[11] Defense counsel objected when the prosecution asked whether McCombs had an opinion as to whether Stanfield's Glock fired the casings that were submitted for examination compared to the test fires. Defense counsel also objected when the prosecutor asked McCombs for her level of confidence regarding whether the casings found at the crime scene were fired from the firearm near Stanfield later that day. Defense counsel further moved to strike McCombs's answer when she testified that she did not have "any doubt" the casings found at the scene were from Stanfield's firearm, taking the position McCombs's responses called for speculation.

[12] Depublished on December 18, 2024. While *Tidd* is an unpublished case, because Stanfield wholly relies on it, we will briefly discuss the case below.

no doubt the bullets found at the scene of the shooting matched the Glock firearm located near Stanfield. He argues McCombs used subjective methods and the prosecution failed to lay a proper foundation for her testimony.

The *Azcona* case concerned a series of shootings and other crimes committed over a one-month period. (*Azcona, supra*, 58 Cal.App.5th at p. 508.) The prosecution's firearm expert testified that the bullet casings recovered from two crime scenes were fired from the same gun " 'to the practical exclusion of all other guns.' " (*Id*. at p. 510.) At a hearing on the defendant's in limine motion, the defendant argued recent studies undermined the reliability of visually comparing toolmarks on bullet casings such that it was no longer admissible under *Kelly*. (*Azcona* at p. 512.) The Sixth District reasoned that even if the firearm toolmark comparison is subject to *Kelly* principles, the defendant failed to meet his burden of showing a clear majority of the scientific community no longer accepted the technique as reliable, although the defendant offered "legitimate criticism from credible sources," which undermined the reliability of visual toolmark comparison as a scientific method. (*Azcona* at p. 512; see *Cowan, supra*, 50 Cal.4th at p. 470 [ballistics comparisons and toolmark identification using molds were not new techniques beyond common understanding and not subject to *Kelly*].)

However, the *Azcona* court found the trial court "abandoned its gatekeeping role" because the expert "presented his opinion in language suggesting scientific certainty" and his high level of certainty was supported merely by his broad reference to numerous studies that "went far beyond what the underlying material supported." (*Azcona, supra,* 58 Cal.App.5th at pp. 512-514.) The toolmark expert only visually compared the marks on the casings found at two different crime scenes; the expert did not explain in detail his visual comparison analysis, the procedure he used other than identifying six markings in a row, nor did he compare test-fires. (*Id.* at p. 510.) The gun itself was never located. (*Id*. at p. 518 (conc. opn. of Greenwood, P.J.).) Still, the expert concluded the matching

16.

marks on the casings were " 'much more than can ever happen by random chance,' and therefore the projectiles came from the same gun, 'to the practical exclusion of all other guns.' " (*Id*. at p. 514.) When asked about the degree of scientific certainty in the expert's conclusion that the two shell casings came from the same gun, the expert testified, " '[i]t would be in the billions to be wrong on this,' " and added that he was " 'so certain' " that he did not believe "there[ ] [was] any reasonable chance' " that he was incorrect. (*Id.* at p. 519 (conc. opn. of Greenwood, P.J.).) The court held the expert's conclusion was a "leap too far from what the underlying method allowed." (*Id*. at p. 514.)

Similarly, the expert in *Tidd* was not certified and only compared a single fired cartridge case found at the scene of the shooting to a "test fired" cartridge case known to have been fired from the pistol found on the defendant when he was later arrested. (*Tidd, supra,* 104 Cal.App.5th at p. 776.) The expert offered no explanation for why he found the similarities more compelling than the differences and failed to provide any basis whatsoever for his opinion that the two cartridge cases he examined came from the defendant's pistol. (*Ibid*.)

Here, the expert testimony is distinguishable from *Azcona* and *Tidd*. McCombs did not testify the bullets were fired from the same gun to any degree of scientific certainty.[13] While she testified that she "didn't have any doubt" the shell casings from the scene had been fired by the Glock located near Stanfield, her opinion was based on her own personal experience, knowledge, observations, and testing she directly participated in. She did not testify to the practical exclusion of all other guns. In fact,

---

**13** At trial, McCombs specifically said that her opinion was based on her own personal confidence level, not to any scientific certainty. We also note that at the Evidence Code section 402 hearing, the trial court limited McCombs's testimony regarding her scientific certainty.

McCombs said she did not compare the casings from the scene to another Glock, so she could not testify regarding other Glocks she did not personally test.

The *Sargon* court held an expert " 'must provide a reasonable basis for the particular opinion offered, and that an expert opinion based on speculation or conjecture is inadmissible.' " (*Sargon*, *supra*, 55 Cal.4th at p. 770.) McCombs presented a basis for her conclusion that the casings recovered from the shooting were fired from the same gun—namely, her observation and analysis of the Glock found near Stanfield and the seven casings recovered from the murder scene. After noting her certification, training, and experience in firearm toolmark and shell casing identification, she explained her opinion was based on the Association of Tool Mark Examiners criteria. Her opinion was also based on the procedure she used, test-firing the Glock located near Stanfield with six rounds of laboratory ammunition into a water tank, and comparing the marks found on the test-fired cartridge cases with marks found on the seven cartridge cases recovered from the crime scene under a microscope. She conceded other experts might reach different conclusions, and recognized there is criticism in the field of toolmark analysis. McCombs's testimony is not found unreliable under *Sargon* because she provided a foundation for her testimony regarding the detail, procedure, and methods she used. We conclude no error occurred in admitting McCombs's expert testimony.

## E. Any Error was Harmless

Even assuming the trial court erred by admitting McCombs's expert testimony, Stanfield has not demonstrated prejudice. When the court erroneously admits expert testimony, reversal is only warranted if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); see also *People v. Venegas* (1998) 18 Cal.4th 47, 93, [applying *Watson* standard to the erroneous admission of expert testimony].)

There is no reasonable probability of a more favorable result absent McCombs's testimony. Stanfield's conviction did not hinge on connecting him to the scene of the crime by way of McCombs's testimony.[14] L.R. identified Stanfield as the shooter. This is not a case where there were no witnesses to the crime scene and the only dispositive evidence linked the spent shell casings at the murder scene to the Glock found near Stanfield later that day. L.R.'s testimony, moreover, was independently corroborated by evidence other than McCombs's testimony. For instance, law enforcement found a Glock firearm near Stanfield after he was shot. His phone was near the scene of the shooting around the time it occurred. Moreover, the jury was presented with competing testimony and was free to reject McCombs's opinion. Faigman testified on behalf of Stanfield. He refuted McCombs's testimony and discussed his concerns with the field of toolmark and firearms examination.

There is not a reasonable chance of a more favorable result even if the jury had not heard McCombs's opinion that Stanfield's gun had fired the casings found at the crime scene. (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050 [" ' "a 'probability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*" ' "].)

## II. Instructional Error Did Not Occur Regarding McElvane's Prior Recorded Statement; Any Presumed Error Was Harmless

Stanfield argues the trial court prejudicially erred by instructing the jury with CALCRIM No. 319, because the instruction improperly shifted the burden of proof by requiring the jury to disregard testimony of an unavailable witness unless it found the

---

[14] We point out the record suggests McCombs testified in Stanfield's first trial that resulted in a hung jury. While we are not privy to McCombs's testimony in the first trial, we note the trial court read McCombs's testimony from the first trial and found it too did not exceed the bounds of *Azcona*. Thus, the record before us shows the addition of McCombs's testimony at the second trial was not so prejudicial as to result in a guilty verdict.

19.

testimony true beyond a reasonable doubt, violating his due process rights and right to present a defense. The People argue Stanfield's claim is forfeited for failure to object, and reaching the merits, contend his rights were not violated by instructing the jury with CALCRIM No. 319. Even assuming error, the People maintain it was harmless. We agree with the People.

## A. Additional Background

Donald McElvane witnessed the incident and made a recorded statement to police approximately two months after it took place, and later testified at Stanfield's first trial. At Stanfield's second trial, the court explained to the jury that McElvane was unavailable, he had testified previously, and his testimony would be read to them as evidence. His recorded interview was also played, as it was in the first trial, for the purpose of assisting McElvane recall his initial statements to law enforcement. The jury was told that the recording would be played for the limited purpose of helping McElvane recall the incident.

### 1. McElvane's Testimony at Trial

McElvane observed a police pursuit of a " 'black SUV' " on the afternoon of March 31. Police officers performed a " 'PIT maneuver,' " which caused Stanfield's car to go into an empty yard and hit a tree. After the car hit a tree, Stanfield ran and two police officers pursued him with firearms.

McElvane did not notice whether Stanfield had a gun. McElvane saw Stanfield run away from the officers. Once Stanfield reached the sidewalk, officers began shooting at him. McElvane heard between eight and 15 gunshots total. McElvane turned around to his family, and once he turned back towards the scene, he saw Stanfield on the ground and officers treating him with CPR. When paramedics arrived about five minutes later, he first saw a black nine-millimeter gun near the gutter. McElvane did not see the

officers recover any items from Stanfield. McElvane's initial response to law enforcement was that he "did [not] see anything" because he did not want to get involved.

### 2. McElvane's Prior Recorded Statement

On July 12, McElvane was interviewed by detectives Antonio Rivera and John Viveros regarding what he saw on the day of the shooting. A recording of the interview was played for the jury. In the recorded interview, McElvane told detectives that his name was Donald Smith. McElvane said it was the afternoon of Easter Sunday and he was in his front yard with his relatives when he heard sirens and saw police chasing a black SUV. The officers, in pursuit of Stanfield, conducted a "PIT maneuver," and spun Stanfield's SUV around. Stanfield's SUV came up onto the grass and hit a tree. Stanfield did not have a gun when the officers were in pursuit of him; the gun found at the scene had been planted.

McElvane was about 30 feet from the scene when he saw officers chase and shoot Stanfield. He did not hear officers say anything to Stanfield while Stanfield was running away from them. Then, McElvane heard about 10 to fifteen gunshots and "a bunch of peoples [*sic*] yelling." When he heard the shots, he tried to get his relatives inside the house. He thought Stanfield died from the shots. He knew there was more than one gunshot because he found holes in his walls after the shooting. McElvane turned his attention toward his family. When he turned back around, officers were performing CPR on Stanfield who was on the ground. At that time, he first saw a black, nine-millimeter gun about three inches from the gutter near Stanfield.

### 3. Jury Instructions

An informal conference regarding jury instructions was held off the record. Thereafter, the trial court summarized the requests on the record and said all requested instructions had been considered. When the court asked the parties whether there were

any objections to the proposed jury instructions, neither the prosecutor nor defense counsel had any objection to instructing the jury with CALCRIM No. 319.

The jury was instructed with CALCRIM No. 319, prior statements of an unavailable witness:

> "Certain witnesses did not testify in this trial, but their testimony, taken at another time, was read for you. In addition to this testimony, you have heard evidence that one or more of the unavailable witness may have made other statements about which other witnesses testified or that were played during the read back of the unavailable witness's testimony. [¶] If you conclude that the unavailable witness made those other statements, you may only consider them in a limited way. You may only use them in deciding whether to believe the testimony of the unavailable witness that was read to you here at this trial. You may not use those other statements as proof that the information contained in them is true, nor may you use them for any other reason."

The jury was also instructed with CALCRIM No. 318, prior statements as evidence:

> "You have heard evidence of statements that a witness made before the trial. If you decide that the witness made those statements, you may use those statements in two ways: [¶] 1. To evaluate whether the witness's testimony in court is believable; [¶] and [¶] 2. As evidence that the information in those earlier statements is true."

## B. Forfeiture

The People argue Stanfield forfeited his challenge to the jury instructions by failing to object. Generally, the failure to object or request a modification of jury instructions in the trial court forfeits the claim on appeal. (*People v. Mason* (2013) 218 Cal.App.4th 818, 823.) Stanfield acknowledges he did not object at trial. Thus, to the extent Stanfield makes a state law claim asserting error on the instruction, the failure to object forfeits his appellate argument. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

Nevertheless, Stanfield contends this court may review the issue because the alleged instructional error violated his substantial rights. (*People v. Franco* (2009) 180

Cal.App.4th 713, 719 (*Franco*) [if the instructional error affected the defendant's substantial rights the forfeiture rule does not apply]; see § 1259.)  " ' "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." ' " (*Franco* at p. 719.)  Stanfield did not forfeit his claim of instructional error involving his substantial rights.

### C.  Standard of Review

We turn to the merits of Stanfield's claim.  A reviewing court reviews de novo whether a jury instruction correctly states the law.  (*People v. Sweeney* (2009) 175 Cal.App.4th 210, 223.)  Our task is to review the instructions given as a whole and the entire trial record to determine "whether the jury was 'reasonably likely' to have construed them in a manner that violates the defendant's rights." (*People v. Rogers* (2006) 39 Cal.4th 826, 873.)  Jury instructions should be interpreted to "support the judgment rather than to defeat it." (*Franco, supra,* 180 Cal.App.4th at p. 720.)

### D.  Analysis

Stanfield contends the instructions prevented the jury from relying upon the out-of-court statement made by McElvane to detectives for the truth of the matter, which lightened the prosecution's burden of proof and violated his constitutional rights. Stanfield contends *Cool v. United States* (1972) 409 U.S. 100 controls this case.  In *Cool*, the defendant relied primarily on the exculpatory testimony of an alleged accomplice. (*Id*. at p. 101.)  The court gave the jury a long " 'accomplice instruction' " to be used in evaluating the accomplice's testimony.  (*Id*. at pp. 101-102.)  In so doing, the jury was unambiguously instructed to ignore exculpatory testimony of the defendant's accomplice "unless it was 'convinced it is true beyond a reasonable doubt.' " (*Id*. at p. 102.)  The *Cool* court found that the instruction placed an improper burden on the defendant and

23.

allowed the jury to convict him despite its failure to find guilt beyond a reasonable doubt. (*Id*. at pp. 102-103.)  In reversing the lower court's decision, our high court reasoned there is a difference between instructing a jury regarding how much weight to accord to the accomplice's testimony and instructing a jury that it must find the testimony true beyond a reasonable doubt before it can consider such evidence.  (*Id*. at p. 104.)

Here, the jury was not instructed to disregard McElvane's recorded statement to detectives unless it found the testimony true beyond a reasonable doubt.[15]  (CALCRIM No. 319.)  Likewise, nothing in the instruction absolved the prosecution of its burden of establishing guilt beyond a reasonable doubt implicating Stanfield's right to due process or the right to present a complete defense.  (*In re Winship* (1970) 397 U.S. 358, 364; see *Washington v. Texas* (1967) 388 U.S. 14, 19.)  CALCRIM No. 319 only limited the use of McElvane's prior statement to detectives as proof the information contained in the recording was true.  The instruction advised the jury it could consider McElvane's prior statement to detectives to evaluate McElvane's read testimony at trial, but it could not consider his prior statement for its truth.  This was proper.  (*People v. Thomas* (2023) 14 Cal.5th 327, 394 (*Thomas*) [CALCRIM No. 319 properly limited a witness's prior statements to a police officer because the statements were hearsay and could not be considered for their truth]; Evid. Code, § 1202.)  Moreover, McElvane's prior statement to detectives was played at the first trial only to refresh his recollection.  The jury was instructed of this at the current trial, and the recorded statement was again played for this limited purpose.[16]  Thus, CALCRIM No. 319 was a correct instruction.

_____

[15]  We also point out the jury was not instructed to disregard McElvane's testimony at the first trial, which was read into evidence because of his unavailability at the current trial, unless it found it true beyond a reasonable doubt.  (See, e.g. CALCRIM No. 318.)

[16]  The transcript of McElvane's prior recorded statement was not provided to the jury and the recording was not transcribed by the court reporter.

### E. Any Error Was Harmless

The question then becomes whether the claimed error in the jury instruction is prejudicial. Depending upon the basis of the claimed error, instructional error is reviewed under either *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), or *Watson*, *supra*, 46 Cal.2d at p. 836. Under the more stringent *Chapman* standard, which applies to errors of constitutional dimension, reversal is required unless the reviewing court can conclude beyond a reasonable doubt the error did not contribute to the verdict. (*Chapman*, *supra*, 386 U.S. at p. 24.) Under the alternative *Watson* standard, which applies to errors of state law, reversal is not required unless it is reasonably probable the defendant would have obtained a more favorable result had the error not occurred. (*Watson*, *supra*, 46 Cal.2d at p. 836.) We need not decide whether the *Chapman* or *Watson* standard for prejudicial error applies here because even assuming error, it was harmless under either standard.

Stanfield identifies no basis for admitting McElvane's prior statement for its truth other than the statement corroborates the defense theory. However, the jury was also instructed with CALCRIM No. 318. The jury was allowed to consider McElvane's read testimony for its truth. There were no substantive inconsistencies between McElvane's prior statement and his read testimony. McElvane maintained he never saw Stanfield with a firearm and the police planted the firearm on Stanfield after they shot him while he was unarmed. In addition to McElvane's testimony, other defense witnesses testified they did not see Stanfield with a firearm, corroborating his defense. McElvane's prior statement to detectives was cumulative, and thus, the failure of the jury to consider the prior statement for its truth was not prejudicial. (*People v. Lucas* (1995) 12 Cal.4th 415, 463-464 [exclusion of the defense investigator's testimony as to what witnesses told him was not prejudicial nor was it a denial of the defendant's due process rights, where

25.

evidence was cumulative and the jury received the excluded testimony by way of other evidence].)

Stanfield concedes the testimony is cumulative, but argues he still suffered prejudice because McElvane's testimony was more credible than the other defense witnesses. We disagree. McElvane's testimony was not without credibility issues. For instance, he initially lied to police and told them he did not witness the shooting because he did not want to get involved with the matter. McElvane was a former gang member and testified he did not trust police. He initially provided law enforcement with a fake last name. We find no prejudice on this record.

Accordingly, we conclude beyond a reasonable doubt the trial court's use of CALCRIM No. 319, limiting the jury to use McElvane's prior statement to detectives for its truth, did not contribute to the verdict.

## III. Instructional Error Did Not Occur Regarding Lopez's Restraints and Custody Status; Any Presumed Error Was Harmless

Stanfield argues the trial court prejudicially erred when the jury was instructed with CALCRIM No. 337, because the witness's custodial status was an important factor in assessing his credibility. He contends the jury instruction violated his due process rights and right to present a defense, and thus remand is required. The People maintain Stanfield's claim is forfeited. Considering the merits, CALCRIM No. 337 was properly given to preserve the defense witness's presumption of innocence, and there was no prejudice. We agree with the People.

### A. Additional Background

Defense witness Ruben Lopez testified at trial. Lopez admitted he was in custody in the Fresno County jail and had prior felony convictions for assault with force likely to cause great bodily injury in 2021 and domestic violence in 2019.

26.

At about 2:00 p.m. on March 31, Lopez saw Stanfield's car "crash" into a gate and Stanfield get out. Police officers made a command to " 'put your hands up' " but Stanfield pulled up his pants and ran. Stanfield was pinned and faced the gate his car crashed into. Stanfield did not have a gun. Then, a "white" police officer shot Stanfield while his hands were at his sides.

The jury was instructed with CALCRIM No. 337, witness in custody or physically restrained:

> "When certain witnesses testified, they may have been physically restrained. Do not speculate about the reason. You must completely disregard this circumstance in deciding the issues in this case. Do not consider it for any purpose or discuss it during your deliberations. [¶] Evaluate the witness'[s] testimony according to the instructions I have given you."

There was no objection from either party when CALCRIM No. 337 was read to the jury.

## B. Forfeiture

Preliminarily, because Stanfield failed to object below, any state law claim asserting error on the instructions have been forfeited. (*People v. Mitchell, supra,* 7 Cal.5th at p. 579.) But, as discussed above, a criminal defendant will not forfeit his claim for failure to object to an instructional error if the substantial rights of the defendant are implicated. (*Franco, supra,* 180 Cal.App.4th at p. 719; § 1259.) Stanfield claims that the instructions deprived him of the right to confrontation and a meaningful opportunity to present a complete defense in violation of the Fifth and Sixth Amendments. Stanfield's argument would affect his substantial rights if true and thus, his claim is not forfeited.

## C. There Was No Instructional Error

"In assessing a claim of instructional error, 'we must view a challenged portion "in the context of the instructions as a whole and the trial record" to determine " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a

27.

way' that violates the Constitution." ' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 831 (*Jablonski*).) Here, the jurors were informed they should "completely disregard" Lopez's physical restraints. Stanfield argues the trial court erred in instructing the jury with CALCRIM No. 337 because the instruction undercut the defense theory and Lopez's credibility. Stanfield contends Lopez's custodial status should have been a factor for the jury to consider because it gave Lopez a motive to cooperate with the prosecution, yet he testified in favor of the defense instead.

We reject Stanfield's claim of instructional error. According to CALCRIM No. 337 Bench Notes, the trial court has a sua sponte duty to give this instruction if the witness is physically restrained in a manner that is visible to the jury. Caselaw also supports this rule. Our Supreme Court held that a limiting instruction must be given when a jury can see that the defendant or defense witness is physically restrained. (*People v. Duran* (1976) 16 Cal.3d 282, 288, fn. 4, 291-292 (*Duran*).)

The First District expanded the *Duran* court's holding and found the instruction regarding physical restraints apply to a defense witness as well as a witness testifying for the prosecution. (*People v. Mackey* (2015) 233 Cal.App.4th 32, 114 (*Mackey*).) In *Mackey*, the defendants contended CALCRIM No. 337 " 'fundamentally undercut the defense theory' " and the jury should have been allowed to consider a prosecution witness's shackling and custody status in evaluating his credibility. (*Mackey* at p. 115.) The *Mackey* court rejected the defendants' argument, and observed CALCRIM No. 337 "did not tell the jury *not* to consider the reasons *underlying*" the prosecution witness's in-custody status.[17] (*Mackey* at p. 115.) The court also found the defendants confused two credibility inferences; while it was proper for the jury to draw credibility inferences based

---

[17] The trial court also instructed the jury with CALCRIM No. 316. (*Mackey*, *supra*, 233 Cal.App.4th at p. 115, fn. 45.)

on the witness's criminal conduct and conflicting stories, it was improper for the jury to draw credibility inferences based only on the witness's custody status or shackles. (*Ibid.*)

The People rely on *Mackey* to establish that instructional error did not occur. Stanfield argues *Mackey* is distinguishable because the defense in that case sought to use the witness's custodial status to diminish the credibility of a prosecution witness and here, Stanfield sought to use Lopez's custodial status to *support* Lopez's credibility. We need not decide whether *Mackey* is distinguishable because we find no error on this record.

Considering the instructions and trial record as a whole, the jury was properly instructed how to evaluate Lopez's credibility. Pursuant to CALCRIM Nos. 105 and 226, the instructions regarding witnesses, the jury was given a variety of factors to consider for all witnesses, including Lopez, which instructed on witness perception, memory, description, bias, character for truthfulness, felony convictions, conduct that reflects upon believability, and promised benefits. The jury was instructed with CALCRIM No. 316, which told the jury they could consider the fact that a witness was convicted of a felony in evaluating the witness's credibility. The jury was told that a conviction does not necessarily destroy or impair the witness's credibility, and it was up to them to decide what weight to give that fact. The court further instructed the jury with CALCRIM No. 318, prior statements of a witness as evidence, and finally, with CALCRIM No. 337, the jury was told to disregard the fact Lopez was physically restrained. The jury was also informed to not speculate regarding the reason for Lopez's physical constraints. The jurors were told to evaluate Lopez's testimony according to the other instructions provided.

In support of Stanfield's contention, he cites *People v. Medrano* (1978) 78 Cal.App.3d 198. In *Medrano*, the defendants were union organizers prosecuted for criminal trespass, and they asserted a free speech defense. (*Id.* at pp. 202, 204; § 602, subd. (n).) The Third District held an instruction that required, as a condition of the

defense, a finding that the purpose of the defendants' entry onto labor camp property was dissemination of thoughts or ideas relating to that property, was erroneous because it withdrew one of the defendants' principal defenses from the jury's consideration. (*Id*. at p. 214.)

Our case is not analogous. Stanfield maintained law enforcement planted the firearm found near him after he was shot, and he was not present for W.S.'s murder. While Lopez presented favorable defense testimony, specifically, that he did not see Stanfield with a firearm, CALCRIM No. 337 did not rob Stanfield of a crucial defense like in *Medrano*. The instruction simply informed the jury they should not consider Lopez's physical restraints in deciding the issues in the case. Moreover, Lopez told the jury he suffered from two prior felony convictions and admitted he was in custody at the time of trial. The jury was allowed to consider his prior convictions. And the record fails to show Lopez had a *motive* to cooperate with the prosecution as Stanfield suggests. Lopez was called to testify because he witnessed the shooting and did not see Stanfield with a firearm.

In sum, CALCRIM No. 337 did not deprive Stanfield of his constitutional right to confront witnesses, present a complete defense, or undermine Lopez's credibility considering the totality of circumstances. In reaching this conclusion, we consider Lopez's admission that he suffered two prior felony convictions and the fact the jury was provided with a variety of additional instructions allowing them to consider other circumstances relevant to Lopez's credibility, bias, or possible motive. There is no reasonable likelihood the jury applied CALCRIM No. 337 in an impermissible or unconstitutional manner. (See *Jablonski, supra,* 37 Cal.4th at p. 831.) We reject Stanfield's claim of instructional error.

### D. Any Error Was Harmless

In any event, we find any purported instructional error harmless even under the more stringent *Chapman* standard. As set forth above, the jury was told about Lopez's criminal history and his custody status. The jury was not precluded from considering these factors. Rather, the jurors were only told not to consider Lopez's physical restraints. As our Supreme Court pointed out, "the prejudicial effect of shackling defense witnesses is less consequential since 'the shackled witness … [does] not directly affect the presumption of innocence.' " (*Duran, supra,* 16 Cal.3d at p. 288, fn. 4.) The record before us reflects that Stanfield's convictions were unattributable to any alleged error. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.)

### IV. The Trial Court Did Not Abuse Its Discretion Investigating Potential Juror Bias

Stanfield argues the trial court erred when it failed to conduct an adequate investigation concerning the possibility that two jurors were improperly biased after they expressed safety concerns due to an outburst by a testifying witness. The People maintain the court conducted an adequate inquiry and determined no further investigation was warranted. We agree with the People.

#### A. Additional Background

##### 1. L.R.'s Emotional Outburst

Defense counsel played the 911 call L.R. made the night W.S. was shot. After the call was played, defense counsel asked L.R. a question and the following colloquy occurred:

> "[L.R.]: Why do we got to go through these questions. He fucking killed him. I'm tired. I'm fucking tired. I got to go. You son of a bitch. I fucking hate you. I need to go, please.
>
> "[THE COURT]: Sit down.
>
> "[L.R.]: I can't do it no more. Please.

31.

"[THE COURT]: Ladies and gentlemen, we're going to be in recess.

"[L.R.]: Please. Why? Why? Oh, Jesus, please."

The trial court immediately escorted L.R. out, removed the jury, and took a recess. Thereafter, the court summarized what occurred outside the jury's presence:

"[L.R.] became very emotional after the playing of the 911 transcript … where the man she described as her [fiancé] was laying dead …. The Court took every step it could take to immediately have the jury removed from the courtroom. [H]er outburst is not unexpected …. I'll allow counsel to cross examine. I'll allow counsel to ask questions about what she said. I believe she stated she expressed hate towards [Stanfield]. You can ask her about that … [it] goes to her bias and motive [for] testifying, but beyond that we'll continue."

Defense counsel moved for a mistrial. After considering the request, the trial court denied the motion. The court noted L.R. had remained calm until defense counsel made a "tactical decision" to play the 911 call, which required L.R. to listen to herself describing the scene where W.S. was "dying." The court opined L.R.'s outburst was not feigned or "manufactured," and "normal" given the circumstances. The court reiterated it immediately instructed the jury to leave the courtroom and would allow defense counsel to ask her about it.

L.R. was brought back in the courtroom and admonished outside the presence of the jury. The trial court acknowledged testifying was difficult but told L.R. she needed to do her "best to just maintain [her] composure." The court further told L.R. to ask for a break before becoming emotional again in the presence of the jury. The court explained:

"[The court] intentionally did not admonish the jury concerning the outburst because it cuts both ways. The jury will receive the standard jury instruction that they're not to consider anything that happens outside the courtroom, but the outburst can be used by either side. The jurors observed it. [L.R.] said things that could be used to show bias. I believe she turned toward [Stanfield] and said I hate you. So I'm going to allow [defense counsel] to cross examine on that and I'll allow [the prosecutor] as well to ask questions about it …. I want to be clear, the Court did consider an admonishment, but there's really no admonishment to give because it was

32.

evidence that happened in front of [the jury] and it was [L.R.'s] testimony and her statements."

Defense counsel responded that he did not believe there was any admonition that could "unring the bell."

## 2. *Two Jurors Expressed Safety Concerns*

Two jurors expressed concern to the judicial assistant after L.R.'s outburst to the effect of "are we safe in the courtroom[?]" The trial court decided not to bring in the jurors individually, but inform the entire panel that a few jurors raised safety concerns to the judicial assistant. The court further indicated it would instruct the jurors to notify the deputy to the judicial assistant if they had any concerns about their safety or their ability to remain fair and impartial, which it would immediately address. The court said the jury saw L.R. express her emotions, which it felt was a normal reaction, but if the jurors had any concerns about their safety or their ability to remain fair and impartial they should advise the court.

Defense counsel said he had concerns regarding the nature of L.R.'s testimony or the fact that numerous supporters and family members were present in the courtroom, which may influence the jury's decision making.

The court responded:

> "We're speculating that the jurors think those people are here either for [Stanfield] or for [W.S.] … I'm going to ask [the jurors] if they have any concerns to immediately notify the Court. I'm not going to bring them in individually. I'm not going to … highlight the issue, but I want to make sure that … if they have a concern about … that or their ability to be fair and impartial, then to notify the Court immediately and we'll address it."

Defense counsel asked the trial court to talk to the two jurors who raised safety concerns in camera. The court denied the request.

In the presence of the panel of jurors, the trial court said:

> "There was … some emotion involved at the conclusion of this morning's session. These are trials and sometimes there [are] emotions in

33.

trials .… ¶ [A]s [two jurors] were exiting the courtroom [they] turned to the judicial assistant and made comments about concerns for safety. If any of you have any concerns for safety or anything about your ability to be fair and impartial … please send a note through the deputy, to [the judicial assistant] … and I [will] address that."

## B. Applicable Law

The right to an unbiased and unprejudiced jury is part of the constitutional right to a trial by jury. (*People v. Taylor* (1992) 5 Cal.App.4th 1299, 1312.) Under section 1089, " ' "[i]f at any time … a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears … the court may order the juror … discharged" ' " In reading this statute, our Supreme Court has held, " ' " '[o]nce a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty "to make whatever inquiry is reasonably necessary" to determine whether the juror should be discharged.' " ' " (*Cowan, supra,* 50 Cal.4th at pp. 505-506.) However, "not every incident involving a juror's conduct requires or warrants further investigation. 'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court. [Citation.] ... [¶] As our cases make clear, a hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case.' " (*People v. Cleveland* (2001) 25 Cal.4th 466, 478.) "Although courts should promptly investigate allegations of juror misconduct 'to nip the problem in the bud' [citation], they have considerable discretion in determining how to conduct the investigation. 'The court's discretion in deciding whether to discharge a juror encompasses the discretion to decide what specific procedures to employ including whether to conduct a hearing or detailed inquiry.' " (*People v. Prieto* (2003) 30 Cal.4th 226, 274.)

34.

### C. Analysis

The trial court did not abuse its discretion by failing to question the two jurors regarding their ability to remain fair and impartial after they raised safety concerns due to L.R.'s emotional outburst.  First, the court never had information regarding the jurors' ability to remain fair and impartial.  Except where bias is clearly apparent on the record, the court " 'is in the best position to assess the state of mind of a juror.' " (*People v. Debose* (2014) 59 Cal.4th 177, 202.)  The court is not required to question jurors individually.

Stanfield speculates reasons for bias, such as the jurors' safety concerns may have been based on a fear of retaliation by gang members.  But these assumptions were not based on any actual bias seen or heard by the court.  The court rightly noted that defense counsel's concerns regarding L.R.'s testimony or the fact that supporters and family members were present in the courtroom, which defense counsel argued had the potential to influence the jury's decision making, was speculative.  The court asked the panel of jurors to report to the court if they could no longer be fair or impartial after the outburst.  No juror came forward.  Similarly, the two jurors who initially expressed safety concerns did not press the matter further.  Because there was no evidence of bias from the jury, there was no need for further investigation.  (See e.g. *People v. Bradford* (1997) 15 Cal.4th 1229, 1349.)

Second, the trial court found L.R.'s emotional outburst to be a "normal" reaction after she heard her own 911 call played.  The court reasoned the outburst was not unexpected and immediately asked the jury to leave the courtroom.  These circumstances did not suggest that other jurors had similar safety concerns to the extent that they, too, might not have been able fairly to perform their duties as jurors.  As the court properly recognized, further inquiry posed the risk of highlighting the outburst.  Our Supreme Court has held this is a legitimate concern and found it appropriate to address the entire

panel of jurors in such instance.  (See *People v. Navarette* (2003) 30 Cal.4th 458, 500 [the court addressed the jurors' safety concerns with the entire panel without privately discussing it with the juror or calling the attention of the entire jury to the specifics of the juror's fears, and thereby preventing the possible spread of the juror's fears].)

Stanfield maintains there is uncertainty in the record because the court did not conduct a proper inquiry, and, therefore, we must conclude he was deprived of his constitutional right to a fair and impartial jury.  However, Stanfield's position overlooks the starting point of the analysis, whether information the court was aware of when it made its decision warranted further inquiry.  (*People v. Cleveland* (2001) 25 Cal.4th 466, 478 [" 'a hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case' "].)  Stanfield seeks to require the court to conduct an inquiry whenever it becomes aware of any indication of a possibility that there might be good cause to remove a juror.  This is not what the law mandates.

Stanfield argues *People v. McNeal* (1979) 90 Cal.App.3d 830 is controlling.  But unlike our case, the *McNeal* court was informed that a juror had personal knowledge regarding testimony of a witness, which would " 'definitely' " effect the way the juror would vote.  (*Id*. at p. 835.)  The court brought the juror into chambers and asked whether she could deliberate fairly and impartially, to which the juror answered in the affirmative, however, the court did not conduct a hearing or inquire into the facts of the juror's knowledge.  (*Id*. at p. 836.)  The First District held the court erred in failing to ascertain the facts which might have impaired the impartiality of the juror.  (*Id*. at p. 837-838.)  Here, the court was not alerted to the possibility that a juror could not properly perform his or her duty or render an impartial and unbiased verdict.

We conclude there was no abuse of discretion in the trial court's decision not to conduct a further inquiry regarding the jurors' safety concerns or potential bias.  We also

find Stanfield has pointed to nothing in the record that would indicate any juror harbored bias against him as a result of witnessing L.R.'s emotional outburst, such that we could conclude there was good cause to remove a juror on that ground, or that any failure to excuse such a juror violated defendant's constitutional right to an impartial jury. (*People v. Martinez* (2010) 47 Cal.4th 911, 943 [" ' "juror's inability to perform a juror's functions must be shown by the record to be a 'demonstrable reality' [and a reviewing court] will not presume bias" ' "].)

## V. The Trial Court Did Not Abuse Its Discretion by Denying the Motion for Mistrial

Stanfield argues the trial court applied the wrong legal standard when it denied defense counsel's motion for mistrial. The People respond there was no abuse of discretion or prejudice on the record. We agree with the People.

### A. Analysis

A mistrial should be granted by the trial court when a party's chances of receiving a fair trial have been irreparably damaged. (*People v. Clark* (2011) 52 Cal.4th 856, 990; accord *People v. Ayala* (2000) 23 Cal.4th 225, 282; *Cowan*, *supra*, 50 Cal.4th at p. 459.) The determination whether a particular incident is incurably prejudicial is a speculative matter, and the court is vested with considerable discretion when ruling on such a motion. (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 634 (*Beck and Cruz*).) We apply that standard here and review the court's ruling for abuse.

The record before us shows the trial court considered a variety of factors and rightly found no prejudice from L.R.'s outburst when it denied Stanfield's motion for mistrial. The court carefully weighed the impact of L.R.'s outburst. As the court observed when making its ruling, the outburst "cuts both ways" and the prosecutor and defense counsel had the ability to question L.R. about it. The court also reasoned the outburst was not unexpected, and the display of emotions may occur in a trial.

37.

Considering these factors, the court implicitly determined the incident was not prejudicial and Stanfield's chances of receiving a fair trial were not irreparably damaged.

The trial court also discussed further admonishing the jury but opined that an admonition would simply highlight the issue. Defense counsel agreed, stating no admonition could "unring the bell." The court determined the lack of admonition was proper. The evidence before the court when it ruled on Stanfield's request for mistrial did not provide a basis for it to conclude that Stanfield's right to a fair trial was irreparably damaged. The court's reasoning was sound. (*Beck and Cruz, supra,* 8 Cal.5th at p. 634; accord *People v. Collins* (2010) 49 Cal.4th 175, 198; c.f. *People v. Hedgecock* (1990) 51 Cal.3d 395, 420 [the trial court abused its discretion when it failed to hold an evidentiary hearing regarding the allegations of jury misconduct when the record showed the court believed it had no authority to hold a hearing to determine the facts of the misconduct].)

Stanfield contends remand is required so the trial court can resolve the factual disputes underlying the issue of prejudice. (See *People v. Braxton* (2004) 34 Cal.4th 798, 818-819 [a reviewing court may remand the matter to the trial court for a belated hearing and ruling on the defendant's new trial motion when the appellate record is insufficient to permit a reviewing court to determine whether the proposed motion would have been meritorious].) But remand is inappropriate here where nothing in the record shows L.R.'s outburst was incurably prejudicial. There was no claimed juror misconduct or showing that the jury's ability to remain fair and impartial was affected by the outburst. The two jurors only raised safety concerns, and when addressed by the court, did not raise them again.

Even if error occurred, moreover, it was harmless beyond a reasonable doubt. (*Chapman, supra;* 386 U.S. at p. 24.) The outburst was brief and isolated. L.R. was under oath when it occurred. She previously testified Stanfield killed W.S.; the outburst was testimony that further stated her beliefs. Moreover, defense counsel made a tactical

decision to play the 911 call, which prompted her reaction. L.R. was cross-examined and there were no further outbursts. The court instructed the panel of jurors to come forward if anything, past or future, affected their ability to be fair and impartial. No juror came forward. The record does not suggest the jurors were affected by L.R.'s outburst such that it was "so incurably prejudicial that a new trial was required." (*People v. Ledesma* (2006) 39 Cal.4th 641, 683.)

## **DISPOSITION**

The judgment is affirmed.

ELLISON, J.[*]

WE CONCUR:

LEVY, Acting P. J.

SNAUFFER, J.

_____

[*] Retired judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.